851 F.2d 1035
 28 ERC 1129, 18 Envtl. L. Rep. 21,343
 DEFENDERS OF WILDLIFE, FRIENDS OF ANIMALS AND THEIR
ENVIRONMENT, and The Humane Society of the United
States, Appellants,
v.
Donald P. HODEL, as Secretary of the Interior, Appellee.
 No. 87-5132.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 15, 1987.
Decided July 8, 1988.
Rehearing and Rehearing En Banc Denied Oct. 14, 1988.
 
 Brian B. O'Neill, Minneapolis, Mn., for appellants.
 John C. Harrison, Washington, D.C., for appellee.
 Before John R. GIBSON, BOWMAN, and WOLLMAN, Circuit Judges.
 WOLLMAN, Circuit Judge.
 
 
 1
 Defenders of Wildlife, Friends of Animals and Their Environment, and the Humane Society of the United States (collectively Defenders) brought this action to challenge a Department of Interior final regulation that provides that United States agencies funding projects in foreign countries have no duty to consult with the Secretary about the projects' impact on endangered species of wildlife or plants. Defenders alleged that the regulation violates the section 7 consultation requirement of the Endangered Species Act, 16 U.S.C. Secs. 1531 et seq. (1982). The district court dismissed the action for lack of subject matter jurisdiction, concluding that Defenders failed to satisfy the standing requirement of Article III, Section 2 of the Constitution, 658 F.Supp. 43. We reverse and remand.
 
 I.
 
 2
 In the Endangered Species Act (the Act or ESA), Congress declared that "the United States has pledged itself as a sovereign state in the international community to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction." 16 U.S.C. Sec. 1531(a)(4) (1982). The Secretary must publish in the Federal Register a list of species of wildlife or plants endangered or threatened with extinction. Id. Sec. 1533(c)(1). See also 50 C.F.R. Sec. 17.11-12 (1986). More than half of the species listed as endangered or threatened are species whose primary ranges are outside of the United States.
 
 
 3
 Under section 7(a)(2) of the Act, 16 U.S.C. Sec. 1536(a)(2), a federal agency that authorizes, funds, or carries out any action must consult with the Secretary to insure that the action is "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." Id. Federal agencies thus have a mandatory duty to insure that their actions will not harm endangered species. See H.Rep. No. 412, 93d Cong., 1st Sess. (1973), U.S.Code Cong. & Admin.News 1973, 2989. The legislative history of the Act "indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." Tennessee Valley Auth. v. Hill, 437 U.S. 153, 174, 98 S.Ct. 2279, 2292, 57 L.Ed.2d 117 (1978) (enjoining completion of multimillion-dollar dam to protect snail darter from extinction).
 
 
 4
 To assist federal agencies in meeting this responsibility, section 7 outlines a process through which agencies are to consult with the Office of Endangered Species of the United States Fish and Wildlife Service or the Office of Protected Species of the National Marine Fisheries Service. The purpose of the consultation process is to supply advice and information, identifying actions that may harm listed species or their habitats. The Secretary must issue a written opinion describing the effect of the proposed agency action on endangered species. If the proposed action will harm endangered species, the Secretary must propose acceptable alternative action. See 16 U.S.C. Sec. 1536(b). After consultation, "the final decision of whether or not to proceed with the action lies with the agency itself. Section 7 does not give the Department of the Interior a veto over the actions of other federal agencies, provided that the required consultation has occurred." National Wildlife Fed'n v. Coleman, 529 F.2d 359, 371 (5th Cir.), cert. denied, 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976); see also Sierra Club v. Froehlke, 534 F.2d 1289, 1303 (8th Cir.1976).
 
 
 5
 The present controversy stems from a final rule, published on June 3, 1986, that limits the scope of consultation. The regulation provides that federal agencies have a duty to consult with the Secretary to insure that any action they authorize, fund, or carry out only "in the United States or upon the high seas" is not likely to jeopardize the continued existence of any listed species. 50 C.F.R. Sec. 402.01 (1986). Previously, consultation on federal agency actions in foreign countries was required. See 50 C.F.R. Sec. 402.04, 43 Fed.Reg. at 874 (1978). Additionally, the new rule defines an "action" as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part by Federal agencies in the United States or upon the high seas." 50 C.F.R. Sec. 402.02 (1986). The Secretary's list of endangered species, however, continues to include species whose primary ranges are outside of the United States.
 
 
 6
 Defenders brought this action to challenge the new regulation. Count I alleged that the Secretary violated section 7(a) of the Act[1] by not providing listed endangered species the full protection guaranteed them, and that the new regulation "threatens imminently and irreparably" Defenders' interests and the interest of the public in the continued application of section 7 of the Act to agency action abroad. Count II alleged that the Secretary's action in promulgating the new regulation was arbitrary, capricious, an abuse of discretion and contrary to law in violation of the Administrative Procedure Act, 5 U.S.C. Sec. 553 and Sec. 701 et seq. Count III alleged that the Secretary violated a statutory duty to conserve endangered and threatened species whose primary ranges are in foreign lands. Defenders asked for a declaratory judgment that the rule was illegal; for injunctive relief enjoining implementation of the new rule; and "that the Court direct defendant to perform the duties owed plaintiffs, specifically to publish forthwith regulations requiring federal agencies to consult on agency actions abroad that may affect endangered or threatened species." First Amended Complaint at 11.
 
 
 7
 The Secretary moved to dismiss the complaint for lack of subject matter jurisdiction on the ground that Defenders had not alleged the existence of a case or controversy and lacked standing to bring the action. The district court agreed that Defenders had not shown a sufficient injury that was traceable to the Secretary's new regulation and thus dismissed the action for lack of jurisdiction.
 
 II.
 
 8
 Article III of the Constitution limits the power of the federal courts to actual "cases" and "controversies." U.S. Const. art. III, Sec. 2. One purpose of the "cases or controversies" requirement is to ensure that the courts will not intrude into areas committed to other branches of government. Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). The doctrines that stem from Article III, such as standing, mootness, ripeness, and political question, relate "to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government." Vander Jagt v. O'Neill, 699 F.2d 1166, 1178-79 (D.C.Cir.1982) (Bork, J., concurring), cert. denied, 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983).
 
 
 9
 Standing is an aspect of justicibility that focuses on the party seeking to bring his complaint before a federal court. "[W]hen standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable." Flast v. Cohen, 392 U.S. 83, 99-100, 88 S.Ct. 1942, 1952-53, 20 L.Ed.2d 947 (1968). To be a proper litigant, the party must have " 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues.' " Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978) (quoting Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)). The Supreme Court summarized the constitutional requirements of standing in Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982):
 
 
 10
 [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976).
 
 
 11
 Id. at 472, 102 S.Ct. at 758.
 
 
 12
 In addition to the constitutional requirements, courts have imposed prudential or policy limitations on a litigant's standing to bring a claim. For example, a plaintiff cannot assert the rights or interests of third parties. Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Also, a court will not decide "abstract questions of wide public significance" most appropriately addressed by the legislature. Id. at 500, 95 S.Ct. at 2206. Furthermore, the plaintiff's complaint must fall within "the zone of interests" to be protected by the statute at issue. Association of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).
 
 
 13
 Unlike the constitutional requirements, Congress may eliminate the prudential limitations by legislation. Gladstone, Realtors v. Village of Bellwood, 441 U.S. at 100, 99 S.Ct. at 1608. Where "Congress has authorized public officials to perform certain functions according to law, and has provided by statute for judicial review of those actions under certain circumstances, the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff." Sierra Club v. Morton, 405 U.S. 727, 732, 92 S.Ct. 1361, 1364-65, 31 L.Ed.2d 636 (1972). In this case, the ESA provides that "any person" may commence a suit to enjoin any person who is alleged to be in violation of the ESA. See 16 U.S.C. Sec. 1540(g). Environmental associations are "persons" and may bring suit in their own name. Id. at Sec. 1532(13). Defenders therefore need meet only the constitutional requirements for standing for their claims under the ESA.[2]
 
 A. Injury in Fact
 
 14
 We turn first to consider the requirement of injury in fact. A threatened injury may constitute an injury in fact. Valley Forge, 454 U.S. at 472, 102 S.Ct. at 758. The Supreme Court has recognized allegations of threatened injury on two situations. The first situation "involves cases in which the plaintiff alleges that governmental action will be taken directly against him." Wilderness Society v. Griles, 824 F.2d 4, 11 (D.C.Cir.1987) (analyzing Supreme Court cases on threatened injury). For example, in Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), drug manufacturers sought pre-enforcement review of regulations concerning labels and advertisements for prescription drugs, arguing that the Commissioner had exceeded his statutory authority. Id. at 138-39, 87 S.Ct. at 1509-10. The Court reasoned that the issue of statutory construction is a purely legal question and that plaintiffs had demonstated that the clash between the government and the plaintiff was sufficiently immediate and direct. Id. at 149-52, 87 S.Ct. at 1515-17.
 
 
 15
 The second situation involves "cases in which the government acts directly against a third party, whose expected response in turn will injure the plaintiff." Wilderness Society v. Griles, 824 F.2d at 11. There, the inquiry is whether "the third party's response to the challenged governmental action will injure the plaintiff at all." Id. The facts of this case fit into the second situation. The Secretary has issued regulations that provide that agencies funding projects abroad need not consult with the Secretary about the projects' impact on endangered species. The agencies are third parties whose actions in proceeding with projects without considering the projects' effects on endangered species will allegedly injure Defenders.
 
 In their complaint, Defenders stated that:
 
 16
 Plaintiffs and their members have an interest in the enforcement and administration of the Endangered Species Act, 16 U.S.C. Secs. 1531 et seq., and observe and enjoy, when possible, endangered and threatened species of wildlife, incuding [sic] those species whose primary ranges are outside the United States. The actions of the defendant harm in fact the plaintiffs by, among other ways, increasing the rate of extinction of endangered and threatened species, species whose presence on earth the plaintiffs observe and enjoy.
 
 
 17
 First Amended Complaint p 5. Defenders submitted affidavits listing pending and ongoing projects in foreign countries that may be harming endangered species.
 
 
 18
 The district court found that Defenders had asserted merely an interest in the enforcement and administration of the ESA. The Supreme Court "has repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." Allen v. Wright, 468 U.S. at 754, 104 S.Ct. at 3326. See also, Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. at 482, 102 S.Ct. at 763; Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 223 n. 13, 94 S.Ct. 2925, 2933 n. 13, 41 L.Ed.2d 706 (1974). Here, however, Defenders also alleged that specific projects in foreign countries which their members had visited were increasing the rate of extinction of endangered species. An interest in aesthetic, conservational, and recreational values will support standing when an organizational plaintiff alleges that its members use the area and will be adversely affected. United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 702, 93 S.Ct. 2405, 2423, 37 L.Ed.2d 254 (1973); Sierra Club v. Morton, 405 U.S. at 734-35, 92 S.Ct. at 1365-66.
 
 
 19
 Defenders also argue that the Secretary's refusal to carry out a statutorily mandated procedure constitutes sufficient injury in fact to confer standing. Defenders rely on Watt v. Energy Action Educational Found., 454 U.S. 151, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981), where the plaintiffs alleged that the Secretary of the Interior had breached a statutory obligation to experiment with various bidding systems for leasing tracts of the outer continental shelf. The plaintiffs had standing to challenge the Secretary's refusal to experiment with various bidding systems because the relief requested--an injunction prohibiting further lease sales until the Secretary issued regulations for alternative bidding systems--would result in the Secretary using the best bidding system. Id. at 162, 102 S.Ct. at 213. In the present case, however, the Secretary correctly points out that in Watt the plaintiffs had alleged an economic, not a procedural, injury.
 
 
 20
 Various courts of appeals have held that agency violations of procedural rights constitute injury in fact. In Trustees for Alaska v. Hodel, 806 F.2d 1378 (9th Cir.1986), five environmental groups filed an action for declaratory and injunctive relief against the Department of the Interior to require the Department to follow all necessary public participation procedures in preparing an environmental impact statement under the National Environmental Policy Act of 1969 (NEPA) before submitting a report to Congress with recommendations concerning possible exploration of oil and gas within the coastal plain. Id. at 1379-80. The Department contended that mere speculation on the contents of the report did not confer standing. The Ninth Circuit disagreed, holding that the environmental groups had standing to challenge alleged agency violations of procedural rights. Id. at 1380. See also Oregon Environmental Council v. Kunzman, 817 F.2d 484, 491 (9th Cir.1987) (procedural defects in environmental impact statement (EIS) preparation create risk that environmental impacts will be overlooked and constitute injury in fact); Munoz-Mendoza v. Pierce, 711 F.2d 421, 428 (1st Cir.1983) (failure to make allegedly mandatory study is procedural error).
 
 
 21
 The Secretary does not contest that a procedural injury may be a judicially cognizable injury in fact. Instead, he responds that Defenders did not allege a procedural injury in their complaint. We disagree. Defenders alleged that they and their members have an interest in the enforcement and administration of the ESA. First Amended Complaint p 5. In their prayer for relief, Defenders requested that "the Court direct defendant to perform the duties owed plaintiffs, specifically to publish forthwith regulations requiring federal agencies to consult on agency actions abroad that may affect endangered or threatened species." Id. at 11. We conclude that Defenders have pleaded a procedural harm as well as harm in the increased rate of extinction of endangered species.
 
 
 22
 B. Fairly Traceable and Likely to be Redressed
 
 
 23
 The Secretary concedes that physical damage to a place an individual personally visits or to animals he actually observes is a type of injury sufficient to confer standing under Article III. The parties disagree over whether this injury to the Defenders' professional and aesthetic interests in the existence of endangered species is traceable to the Secretary's action in promulgating the new regulation and whether the injunctive relief sought will redress the complained-of injury.
 
 
 24
 The district court raised questions concerning the projects that the Defenders listed as increasing the rate of extinction of endangered species. Several of the projects were funded by the World Bank, which is not a federal agency. Other projects had been halted or completed. None of the projects was initiated subsequent to the publication of the new rule. The district court therefore concluded that no harm could have yet resulted from the new rule.
 
 
 25
 On appeal, Defenders argue that harm has resulted from the new rule because no consultation was ever done on the ongoing Mahaweli project in Sri Lanka, funded by the Agency for International Development (AID). Eight endangered species--the Indian elephant, leopard, purple-faced langur, toque macaque, red-face malkoha, Bengal monitor, mugger crocodile, and python--are found in the project area. Although there is a continuing need for consultation, under the new rule AID will never be compelled to consult with the Secretary about the project's effect on endangered species. A member of Defenders who has visited the area of the Mahaweli project for the purpose of observing its wildlife will be injured.
 
 
 26
 The district court also reasoned that consultation might have already occurred. In ruling on a motion to dismiss for want of standing, however, the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Warth v. Seldin, 422 U.S. at 501, 95 S.Ct. at 2206. Defenders' affidavits attached to the complaint alleged that for the ongoing Mahaweli project, no section 7 consultation has ever been conducted. Accordingly, it was inappropriate for the district court to surmise that consultation might already have occurred.
 
 
 27
 Additionally, reinitiation of formal consultation is required when "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." Sierra Club v. Marsh, 816 F.2d 1376, 1387 (9th Cir.1987) (emphasis deleted) (quoting 50 C.F.R. Sec. 402.16(b)). Defenders cited AID's Picchis-Palcazu community forestry project in Peru as threatening harm to endangered species, including the jaguar, uakari, and Geoldi's marmoset. Also, the Bureau of Reclamation has a nine-year commitment (1982-1991) to aid in the rehabilitation of the Aswan High Dam on the Nile in Egypt. This project threatens the endangered Nile crocodile. Thus, even in the ongoing projects in which consultation has occurred, changed circumstances could require additional consultation. We therefore conclude that the district court should not have rejected as irrelevant the projects that Defenders identified on the ground that none was initiated subsequent to the promulation of the new rule.
 
 
 28
 The district court found that the threatened harm from current and pending projects failed to meet the causation requirement for two additional reasons: (1) there was no indication that the projects would affect endangered or threatened species; and (2) the Defenders had not sought to enjoin the action agency.
 
 
 29
 Defenders argue that a litigant's standing to challenge the new regulation does not depend on proof that the projects will harm endangered or threatened species. Implicit in Defenders' allegation of procedural injury is the creation of a risk that harm to endangered species may be overlooked by an agency's failure to consult. Defenders correctly point out that the district court's reasoning would require the environmental groups to conduct their own independent investigation before commencing an action. The Ninth Circuit rejected a similar requirement under the NEPA:
 
 
 30
 Were we to agree with the district court that a NEPA plaintiff's standing depends on "proof" that the challenged federal project will have particular environmental effects, we would in essence be requiring that the plaintiff conduct the same environmental investigation that he seeks in his suit to compel the agency to undertake. Compliance with NEPA is a primary duty of every federal agency; fulfillment of this vital responsibility should not depend on the vigilance and limited resources of environmental plaintiffs. It is the federal agency, not environmental action groups or local government, which is required by NEPA to produce an EIS.
 
 
 31
 City of Davis v. Coleman, 521 F.2d 661, 670-71 (9th Cir.1975) (footnote omitted).
 
 
 32
 In arguing that Defenders have not proved the necessary causation, the Secretary relies on Allen v. Wright, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). There, the Supreme Court held that parents of black children attending public schools lacked standing to challenge the sufficiency of Internal Revenue Service regulations that would deny tax-exempt status to racially discriminatory private schools. The chain of causation between the regulations and the plaintiffs' diminished ability to have their children educated in a racially integrated public school was found to be too speculative and indirect to support standing and depended on the independent actions of various third parties not before the court. The plaintiffs had not shown that "there were enough racially discriminatory private schools receiving tax exemptions" in the community to make a difference. Id. at 758, 104 S.Ct. at 3328. Also, it was entirely speculative "whether withdrawal of a tax exemption from any particular school would lead the school to change its policies" or "whether any given parent of a child attending such a private school would decide to transfer the child to public school as a result" of any change in policy. Id.
 
 
 33
 The Secretary argues that to establish traceability in this case, Defenders must show that the new regulation caused the action agencies not to consult with the Secretary and that the failure to consult led to programs being designed in a way that would harm endangered species. He argues that it is mere speculation that consultation would have made any difference, noting that in two of the projects, AID conducted its own environmental assessment. Additionally, the final design of the project depends on the independent actions of the host countries, who are third parties not before the court.
 
 
 34
 Furthermore, the Secretary argues that to prove redressability, Defenders must show that an injunction requiring the Secretary to issue a regulation requiring consultation on foreign projects would actually result in consultation, which in turn would result in a change in the project. The Secretary argues that an injunction against the new rule would not directly force the agencies to consult because the agencies' obligations stem from the ESA itself, not the regulation.
 
 
 35
 Defenders respond that the Secretary's reliance on Wright, a taxpayer case, is unfounded. They contend that this case is more akin to United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), and other environmental cases. In SCRAP, an environmental association challenged the Interstate Commerce Commission's failure to suspend a surcharge on railroad freight rates as violative of the Commission's statutory duty, on the ground that it had failed to file a detailed environmental impact statement. United States v. SCRAP, 412 U.S. at 679, 93 S.Ct. at 2411. The Court acknowledged that, in contrast to the situation in Sierra Club v. Morton, it was being asked to follow a "more attenuated line of causation" from the increased rates to their economic, recreational and aesthetic harm. Id. at 688, 93 S.Ct. at 2416.
 
 
 36
 [A] general rate increase would allegedly cause increased use of nonrecyclable commodities as compared to recyclable goods, thus resulting in the need to use more natural resources to produce such goods, some of which resources might be taken from the Washington area, and resulting in more refuse that might be discarded in national parks in the Washington area.
 
 
 37
 Id. Notwithstanding this rather tenuously linked chain of causation, the Court held that the plaintiffs had standing. Id.
 
 
 38
 We agree with Defenders that the facts of this case are more like SCRAP than Allen v. Wright. Significantly, Allen v. Wright involved a constitutional challenge, whereas this case involves, as did SCRAP, questions of statutory interpretation. Commentators have noted that if a "plaintiff is protesting a claimed invasion of a generalized constitutional injury, the Court appears to be more reluctant to find standing * * * than in cases where the plaintiff is arguably within the zone of interests protected by a federal statute, or a statute appears to grant standing in the case." 1 R. Rotunda, J. Nowak & J. Young, Treatise on Constitutional Law 129-30 (1986). Unlike Allen v. Wright, Congress has in this case granted standing to "any person" to enforce the ESA.
 
 
 39
 One rationale used to support a finding of causation in cases challenging agency regulations is that Congress itself has legislated the requisite causation and redressability. See Center for Auto Safety v. NHTSA, 793 F.2d 1322, 1334-35 (D.C.Cir.1986); see generally, Wald, The D.C. Circuit: Here and Now, 55 Geo.Wash.L.Rev. 718, 723 (1987) (discussing separation of powers issues relating to standing). In Center for Auto Safety, consumer associations challenged the agency's failure to promulgate stringent fuel efficiency regulations, as required by the Energy Policy and Conservation Act of 1975. The organization alleged that its members were injured by being deprived of the opportunity to purchase fuel efficient cars. The agency countered that the regulation would have no practical effect on the types of vehicles available. The court found standing on the ground that Congress had determined that the automobile industry would comply with more stringent fuel efficiency standards instead of paying fines. "If setting a higher standard cannot result in vehicles with increased fuel efficiency, then the entire regulatory scheme is pointless." Id.
 
 
 40
 We agree with Defenders' contention that Congress has determined that the remedy for the harm to their members' personal, professional, and aesthetic interest in endangered species is consultation between the Secretary and the action agency. Thus, the same considerations that supported the finding of standing in Center for Auto Safety are present here.
 
 
 41
 Finally, we disagree with the district court's reasoning that the Defenders should have enjoined the agency action rather than the new regulation. We see no reason to require Defenders to seek to enjoin the construction of a project. We are satisfied that an injunction requiring the Secretary to publish regulations mandating that federal agencies consult on agency actions abroad would result in consultation, which in turn would foreclose the possibility that serious harm to endangered species will be overlooked.
 
 
 42
 The order dismissing the complaint is reversed and the case is remanded to the district court for further proceedings consistent with this opinion.
 
 
 43
 BOWMAN, Circuit Judge, dissenting.
 
 
 44
 I respectfully dissent from the Court's slightly surrealistic holding that the plaintiffs have standing to maintain this lawsuit. The constitutional requirements for standing compel, it seems to me, the opposite result. The Supreme Court of the United States has stated that, at an irreducible minimum, Article III requires plaintiffs to allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief. See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). This irreducible minimum is a "core component derived directly from the Constitution." Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).
 
 
 45
 Plaintiffs therefore must show that their alleged injury (increased likelihood of diminished opportunities to enjoy viewing endangered species in foreign lands) is traceable to the defendant's allegedly unlawful conduct and that the relief requested will redress the injury. I part company with the majority at this point in the analysis because I do not believe that plaintiffs have made this showing.
 
 
 46
 As to the traceability requirement, I believe that the purported causal link between the challenged regulation and any harm to endangered species in foreign lands is far too speculative, attenuated, and remote to support standing. The Endangered Species Act (ESA) does not give the Secretary the power to order an action agency to comply with his requests or to veto its decisions. See Sierra Club v. Marsh, 816 F.2d 1376, 1386 (9th Cir.1987). Nor does the Secretary have any power to direct the actions or decisions of a foreign country. Even if the action agency independently decided to forego participation in a foreign project, it is entirely speculative whether the host nation would abandon its plans or seek the withdrawn aid, be it funding or technical assistance, from another source. "[U]nadorned speculation will not suffice to invoke the federal judicial power." Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 44, 96 S.Ct. 1917, 1927, 48 L.Ed.2d 450 (1976).
 
 
 47
 It is no answer in this case to say that the Secretary's alleged failure to comply with the statute (by not requiring the action agencies to consult with him on foreign projects) creates the risk that harm to endangered species may be overlooked by an agency's failure to consult. See ante at 1042. The ESA itself, independent of the regulations promulgated thereunder, imposes an obligation on the agencies that assist overseas projects to insure that their actions are not likely to jeopardize the continued existence of any threatened species. See 16 U.S.C. Sec. 1536(a)(1)-(2). The consultation process, or the lack thereof, in no way diminishes this duty.[1]
 
 
 48
 As to the redressability requirement, I cannot discern how the relief that plaintiffs seek would effectively address their alleged injury. As previously mentioned, even if the Secretary is ordered to require the action agencies to consult with him regarding foreign ventures, the action agency and the host nation still would be legally entitled to exercise their independent judgment concerning proposed projects. Further, regardless of the availability of consultation, the action agency has a duty under the ESA to insure the environmental soundness of its operations.
 
 
 49
 The Court's response to these concerns is the assertion that "Congress itself has legislated the requisite causation and redressability." Ante at 1043. Even accepting as correct, as the Court does, ante at 1043, plaintiffs' "contention that Congress has determined that the remedy for the harm to their members' personal, professional, and aesthetic interest in endangered species is consultation between the Secretary and the action agency," it does not follow that plaintiffs have satisfied the constitutional requirements for standing. For it is the courts, not Congress, which must decide whether Article III, Section 2 of the Constitution has been satisfied in the circumstances of the particular case. We cannot satisfy this duty by deciding that Congress may have intended for us to exercise jurisdiction--an intention, by the way, that is far from clear; we must decide that the Constitution authorizes us to do so.
 
 
 50
 Read literally, the citizen suit provision of ESA, 16 U.S.C. Sec. 1540(g), authorizes "any person" to bring suit to enjoin "violation of any provision [of ESA] or regulation issued under the authority thereof." This provision does not advert in any way to any of the constitutional requirements for standing. To construe section 1540(g) as the Court does is to attribute to Congress the unexpressed intent to dispense with standing requirements entirely, and to allow "any person" to sue for an injunction against "violation of any provision" of ESA or its regulations. Surely Congress did not intend this provision to be read in a vacuum, without regard to constitutional limitations.
 
 
 51
 For the reasons adumbrated above, I would affirm the decision of the District Court dismissing this action for lack of standing.
 
 
 
 [1]
 The Act includes a citizen suit provision, 16 U.S.C. Sec. 1540(g), wbich states in pertinent part:
 (1) Except as provided in paragraph (2) of this subsection any person may commence a civil suit on his own behalf--
 (A) to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof; * * *
 * * *
 The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any such provision or regulation, or to order the Secretary to perform such act or duty, as the case may be.
 
 
 [2]
 Defenders have also alleged a violation of section 702 of the Administrative Procedure Act (APA), 5 U.S.C. Sec. 702 (Supp. II 1982), which provides that persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute" may bring suit to challenge a final agency action. Under the APA, plaintiffs must show that "the challenged action[ ] caused them 'injury in fact,' and that the alleged injury was to an interest 'arguably within the zone of interests to be protected or regulated' by the statutes that the agencies were claimed to have violated." Sierra Club v. Morton, 405 U.S. at 733, 92 S.Ct. at 1365. See also Japan Whaling Ass'n v. American Cetacean Society, 478 U.S. 221, 106 S.Ct. 2860, 2866 n. 4, 92 L.Ed.2d 166 (1986). An interest in preserving endangered species is directly within the zone of interests of the ESA
 
 
 [1]
 The record demonstrates that the action agencies take this duty very seriously. The claim that formal consultation with the Secretary would have any impact on the concern of these agencies for the protection of endangered species or their actual decisions on particular projects is at best conjectural