PACIFIC NORTHWEST GENERATING COOPERATIVE, Plaintiff–Appellant,

v.

Ronald H. BROWN, in his official capacity as Secretary of Commerce; National Marine Fisheries Service; Pacific Fishery Management Council; North Pacific Fishery Management Council; U.S. Fish & Wildlife Service, Defendants–Appellees,

State of Oregon, Defendant–Intervenor–Appellee.

ALUMINUM COMPANY OF AMERICA, Columbia Aluminum Corporation; ELF Atochem North America; Columbia Falls Aluminum Company; Intalco Aluminum Corporations; et al., Plaintiffs–Appellants,

v.

Ronald H. BROWN, in his official capacity as Secretary of Commerce; United States Department of Commerce; National Marine Fisheries Service; Pacific Fishery Management Council; North Pacific Fishery Management Council; et al., Defendants–Appellees.

State of Oregon, Defendant–Intervenor–Appellee.

PUBLIC POWER COUNCIL, Plaintiff–Appellant,

v.

Barbara H. FRANKLIN; United States Department of Commerce; National Marine Fisheries Service; Pacific Fishery Management Council; North Pacific Fishery Management Council, et al., Defendants–Appellees.

State of Oregon, Defendant–Intervenor–Appellee.

Nos. 93–35531, 93–35532 and 93–35536.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 7, 1994.

Decided June 3, 1994.

Amended Sept. 28, 1994.

R. Erick Johnson and R. Daniel Lindahl, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, OR, for plaintiff-appellant Pacific Northwest Generating Co-op.

Jeffrey W. Ring and James L. Buchal, Heller, Ehrman, White & McAuliffe, Portland, OR, for plaintiff-appellant Aluminum Co.

Gregory J. Miner and Cynthia Lombardi, Bogle & Gates, Portland, OR, for plaintiff-appellant Public Power Council.

Jack C. Wong and Thomas C. Lee, Asst. U.S. Attys., Portland, OR, and Martin W. Matzen, Charles R. Schockey, Fred R. Disheroon, and J. Carol Williams, U.S. Dept. of Justice, Environmental and Natural Resources Div., Washington, DC, for defendant-appellee Brown.

Stephanie Striffler, Asst. Atty. Gen., Salem, OR, for defendant-intervenor-appellee.

Before: BROWNING, KOZINSKI, and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

Salmon and waterpower, the two great natural resources of the Columbia River Basin, have been in tension with each other for over half a century as they have been put to use by human hands and mouths. In our case the principal consumers of the power attempt to align themselves on the side of the salmon—an irrelevant paradox, a fatal contradiction or a new beginning with possibilities for ill or good?

The Aluminum Company of America and other companies purchasing power from the Bonneville Power Administration (the Direct Service Industries), the Pacific Northwest Generating Cooperative, and the Public Power Council (collectively the plaintiffs) brought actions against Robert H. Brown, Secretary of Commerce, and a variety of other federal defendants including the Bonneville Power Administration (the defendants). The actions challenged the defendants' response to the listing of three salmon populations on the Snake River as endangered or threatened. The cases were consolidated for decision by the district court, 822 F.Supp. 1479 (D.Or. 1993), and we have consolidated them for decision on the appeals by the plaintiffs from the judgment of the district court.

## BACKGROUND

The district judge, highly knowledgeable in these matters from his judicial experience, made an excellent statement of the relevant facts, the relevant statutes, the proceedings, and the care with which this complex multistate river management operation must be approached. 822 F.Supp. at 1483–92. We depend upon this statement together with the admitted allegations and stipulated facts in presenting a summary of the most significant points:

1. Government regulation of the Columbia River Basin, of which the Snake River forms a part, is extensive; the Endangered Species Act of 1973 adds another layer of law to an area already heavily laden with regulation.

2. The Columbia River Fisheries Management Plan adopted by the district court on October 7, 1988, governs much of the harvesting of fish challenged by the plaintiffs here. *See United States v. Oregon,* 699 F.Supp. 1456 (D.Or.1988), *aff'd,* 913 F.2d 576 (9th Cir.1990), *cert. denied,* 501 U.S. 1250, 111 S.Ct. 2889, 115 L.Ed.2d 1054 (1991). The signatories to the plan include the Unit-

ed States of America, the Bureau of Indian Affairs, the Fish and Wildlife Service, the State of Idaho, the representatives of the States of Oregon and Washington to the Oregon–Washington Compact, the Nez Perce Tribe, the Confederated Tribes of the Umatilla Indian Reservation, the Confederated Tribes of the Warm Springs Reservation, the Yakima Indian Nation, and, subject to certain limitations, the Shoshone–Bannock Tribe. The Plan reflects the critical need for coordinated and centralized management of fish in the Columbia River Basin to protect the fish and to protect the balance between Indian fisheries governed by treaty and non-treaty fisheries.

3. The endangered or threatened status of the three listed salmon populations is unchallenged. On November 20, 1991 the National Marine Fisheries Service listed Snake River sockeye salmon as an endangered species under the Endangered Species Act. 56 Fed.Reg. 58,619. On April 22, 1992 the National Marine Fisheries Service listed Snake River spring/summer chinook salmon and Snake River fall chinook salmon as threatened species. 57 Fed.Reg. 14,655.

4. In 1992 the Army Corps of Engineers and the Bureau of Reclamation, two of the defendants, increased water flows in the Columbia River system in order to create water spills at the dams and to increase the velocity of the river in order to benefit the migration of juveniles of the listed species by enhancing the speed and success of the smolts' journey downstream. This action diminished the use of the water for power production and raised the cost of power supplied by the Bonneville Power Administration, the marketer of the power.

5. The Direct Service Industries purchase thirty percent of the power supplied by the Bonneville Power Administration. One-quarter of their power may be interrupted by that agency, in which event the industries must either restrict their own output or buy more power from more expensive sources. The industries estimate that in 1992 power interruptions increased their power costs by approximately $3.5 million per month. The Public Power Council, a nonprofit corporation comprised of consumer-owned utilities

and cooperatively owned utilities, given by 16 U.S.C. § 832c(b) preference and priority in the purchase of power from the Bonneville Power Administration, buys forty-three percent of that agency's power. The Pacific Northwest Generating Cooperative, a generation and transmission cooperative and power manager for twenty-nine rural electric cooperatives, also purchases power from the Bonneville Power Administration. Like the Direct Service Industries and the Public Power Council the price it pays is affected by the costs of the Bonneville Power Administration.

## PROCEEDINGS

The Direct Service Industries brought their suit against the following ten federal defendants: the Secretary of Commerce, the United States Department of Commerce, the National Marine Fisheries Service, the Pacific Fishery Management Council, the North Pacific Fishery Management Council, the Fish and Wildlife Service, the Bureau of Land Management, the Army Corps of Engineers, the Forest Service, and the Bonneville Power Administration. The suit alleged violations of the Endangered Species Act and the Administrative Procedure Act. The industries alleged that the National Marine Fisheries Service in its biological opinions of May 1, 1992 and June 12, 1992 had violated § 7 of the Endangered Species Act by failing to consider the "cumulative impact" of all fisheries on the listed species; by not basing its "no jeopardy" findings on the best scientific and commercial evidence; and by issuing "incidental take" statements whereby members of the listed species were harvested, traded, and transported. The plaintiffs further charged that the Secretary of Commerce, the Department of Commerce, the Pacific Fishery Management Council, the North Pacific Fishery Management Council and the Fish and Wildlife Service had failed to insure that harvest regulations were not likely to jeopardize the listed species; that the National Marine Fisheries Service and the North Pacific Fishery Management Council had failed to consult concerning the effect of North Pacific ocean fisheries; and that the National Marine Fisheries Service,

Pacific Fishery Management Council, North Pacific Fishery Management Council, and the Fish and Wildlife Service had failed to enforce the Endangered Species Act, §§ 9 and 10.

These plaintiffs further alleged that the Forest Service, the Bureau of Land Management, and the National Marine Fisheries Service in violation of § 7 had failed to engage in adequate consultations concerning the effects of agency actions on the habitat of the listed species; that the Forest Service and Bureau of Land Management had failed to insure that actions on federal lands which they authorized, funded or carried out were not likely to jeopardize the species; and that these defendants, the Army Corps of Engineers and the Bonneville Power Administration had failed to engage in consultations concerning the effects of hatchery operations and to insure that hatchery actions authorized by them did not jeopardize the species. All of the challenged actions were also characterized as violations of the Administrative Procedure Act in being arbitrary, capricious, an abuse of discretion and not in accordance with law.

The Direct Service Industries made a request for comprehensive relief, including a declaratory judgment that all statements allowing harvest of the listed species in a mixed stock fishery violated § 7 of the Endangered Species Act; that grazing, timber harvest, roadbuilding, and recreational uses on federal lands constituting habitat of the listed species could not be permitted by the Forest Service and Bureau of Land Management unless specifically authorized after a § 7 consultation and biological opinion finding no jeopardy; and similarly that hatchery releases into the Columbia and Snake Rivers were unlawful unless specifically authorized by a § 7 consultation and biological opinion. The plaintiffs also asked for an injunction requiring that the relevant defendants issue regulations halting all harvest of the listed species; that the National Marine Fisheries Service enforce a prohibition of trade or transportation of the harvested members of the listed species; that the Forest Service and Bureau of Land Management halt all grazing, logging, roadbuilding, and recre-

ational use of federal land constituting spawning habitat for the listed species until authorized pursuant to a § 7 consultation and biological opinion; and that similarly the Fish and Wildlife Service, the Army Corps of Engineers, the National Marine Fisheries Service, and the Bonneville Power Administration not release, authorize or fund the release of any hatchery fish until authorized pursuant to a § 7 consultation and biological opinion.

The Public Power Council's complaint closely mirrored the challenges to the May 1 and June 12 biological opinions and incidental take statements on the grounds that they violated § 7 of the Endangered Species Act and the Administrative Procedure Act. Its complaint, however, made no claims directly under § 9 and added an additional claim that the June 12 incidental take statement failed to include reasonable and prudent measures of mitigation.

Pacific Northwest Generating Cooperative challenged the April 10, 1992 biological opinion issued by the National Marine Fisheries Service following consultation with the Army Corps of Engineers, the Bureau of Reclamation and the Bonneville Power Administration concerning the 1992 operation of the Columbia River Power System and the projected impact of hydropower operations in it upon the listed species. The challenged opinion took into account a biological assessment issued by the Army Corps of Engineers and the Bonneville Power Administration in January 1992, an assessment that focused on the mortality of the salmon in their downriver journey. The Pacific Northwest Generating Cooperative contended that the agencies should have considered the impact of the proposed actions on the entire life cycle of the salmon and that the agencies had failed to take into account the impacts of habitat, hatchery and harvest upon the salmon, all in violation of § 7 of the Endangered Species Act and the Administrative Procedure Act. These plaintiffs sought declaratory relief and an injunction against the imposition of flow restrictions set out in the April 10 opinion.

As a conclusion to its opinion the district court held that all the plaintiffs lacked standing to pursue claims under the Endangered

Species Act. Alternatively, it held that the plaintiffs' claims as to the defendants' failure to conduct consultations on habitat and hatchery issues in 1992 were moot. 822 F.Supp. at 1511. Considering the claims on incidental take on the merits, the district court rejected them. *Id.* at 1509–10. From the grant of summary judgment to the defendants all the plaintiffs appeal.

## ANALYSIS

Congress has created specific legislation designed to conserve both the anadromous fish and the waterpower of the Columbia River Basin. In addition it has imposed on all federal agencies the obligation to insure that they do not destroy a listed species. Apparently uncertain that the federal agencies would carry out this obligation, Congress has provided for citizen monitors who, by appeal to the courts, can assure fidelity in its execution. Not every citizen is made a monitor—only those who have a particular kind of interest in the actions of the relevant federal agency.

[1] To determine whether that interest existed here, the district court applied the criteria of *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992), which noted "that the irreducible constitutional minimum of standing contains three elements." The three elements are an actual or imminent invasion of a concrete and legally protected interest; a causal connection between that invasion or injury and the conduct of the defendant, so that the injury is not the result of "the independent action of some third party not before the court"; and that it is likely, not speculative, that the injury will be redressed by a favorable decision. *Id.*

■■■■ To begin with the non-economic interests asserted, the Pacific Northwest Generating Cooperative asserts its customers' aesthetic and recreational interests in the salmon. There is nothing to show that the company in making this claim is protecting an interest germane to its own purposes. *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). The Direct Service Industries assert the interests of their employees in the salmon. Again, their employees' interests are not germane to the industries' own purposes and cannot be asserted by them. Finally, the Direct Service Industries also point to the money they have spent in subsidizing the study of salmon at universities and the interest they have taken in public forums on the subject of the salmon. A cognizable claim of injury cannot be created by a corporation subsidizing research in a topic at a university; otherwise it would be an easy matter for any corporation anywhere to create its own standing by an appropriate grant for academic research; nor does participation in public discussion of a topic equate with an interest that can be asserted in federal litigation. None of these plaintiffs assert an environmental interest which they as businesses enjoy. We turn to the plaintiffs' economic interest.

■■■ The district court acknowledged that the plaintiffs had suffered an economic injury in fact as a result of increased costs associated with the defendants' flow augmentation measures. 822 F.Supp. at 1501–02. However, the court found that the legally protected interest of the plaintiffs "relates to the *water* resource, not the fish," *id.* at 1503 (emphasis in original); and that to protect their interest in a statutorily mandated stable and economical power supply, the plaintiffs had to proceed under the Northwest Power Act, judicial jurisdiction of final actions under which rests with the Ninth Circuit, 16 U.S.C. § 839f(e)(5). The district court clinched this point by finding the salmon to be, in effect, a ward of the court, or like a ward of the court, and concluding that all the plaintiffs were disabled from representing the salmon by a conflict of their interests with the salmon's. The plaintiffs' interest, the court found, was in shifting the economic burden put on them, rather than conservation of the listed species. 822 F.Supp. at 1504–06.

Further, as to causation, the district court noted that *Defenders* held that when the asserted injury arose from the government's allegedly unlawful regulation or lack of regulation of a third party the plaintiff had the burden of showing that the choices of the third party "have been or will be made in

such manner as to produce causation and permit redressability of injury." *Defenders,* —— U.S. at ——, 112 S.Ct. at 2137. The district court found that the plaintiffs had failed to show that the consultations requested by the plaintiffs and the ban on take of the listed species would cause the listed species to rebound to such an extent that flow augmentation and spill releases were no longer necessary to aid the survival of juvenile salmon.

> As to redressability the district court found the following:

> As noted in the Northwest Power Council's 1991 Plan, and as exhibited in the last year, there are a number of stresses that have been placed upon the FCRPS [Federal Columbia River Power System] completely unrelated to the listed species including drought conditions—the "worst in 50 years," dramatic population increases, Trojan's closure and federal pressure to step-up Bonneville loan payments. Another significant factor not addressed by the parties includes Canadian salmon fishing currently under re-negotiation in the Pacific Salmon Treaty talks.

> 822 F.Supp. at 1502.

> . . . .

> As the biological opinions noted, only the Snake River fall chinook are appreciably impacted by PFMC [Pacific Fisheries Marine Council] ocean and in-river harvests. Snake River sockeye are not caught and the chance of catching a Snake River spring/summer chinook is minimal given timing and area restrictions. However, according to figures compiled by the Columbia River Inter-Tribal Fish Commission in a report dated November 20, 1992, mortality rates of Snake River fall chinook (based upon averages from CWT recoveries between 1988–1990) from harvest activities may be broken down geographically as follows:

> (1) Alaskan Ocean Harvest (NPFMC) [North Pacific Fishery Management Council]: 5%

> (2) Vancouver Island Troll Fishing: 16.1%

> (3) Other British Columbia Fishing: 5.6%

> (4) U.S. Ocean below the Canadian border (PFMC) [Pacific Fishery Management Council]: 12.6%

> (5) In–River Tribal: 20.6%

> (6) In–River Non–Tribal: 8%

*Id.* at 1503.

The total take in jurisdictions subject to the United States was found to be 25.6 percent of the fall Chinook. An elimination of this take would not be substantial enough, the district court found, to remove the fall Chinook from the threatened list, even if the assumption were indulged, contrary to likelihood, that the tribes did not increase their harvest when more Chinooks were available. The district court also noted that the tribes were not before the court and any decree on take would have implications for their harvesting rights. The district court concluded that these factors made it speculative that judicial relief would redress the claimed harm.

■ The plaintiffs argue that it must be presumed that the consultations prescribed by the Endangered Species Act will result in benefit to the species and that it is obvious that any total ban on harvesting the listed species will be to the species' benefit. But what is far from obvious is that the benefit to the species will be of sufficient magnitude to require the Bonneville Power Administration to change the flow and spill requirements designed to aid the species or lower the rates it must charge in order to finance conservation measures for the species. Moreover, as the district court held, these suits in the district court cannot reach the Bonneville Power Administration. *Id.* at 1503. As we have now explicitly held, challenge under the Endangered Species Act to a final action of that agency based upon an administrative record must be brought in our court. *Northwest Resources Information Ctr. v. Bonneville Power Admin.,* 25 F.3d 872 (9th Cir. 1994). The agency that determines the plaintiffs' costs is improperly a defendant here. The plaintiffs have not shown error in the district court's findings that causation is unproved and that the redressability is speculative.

*Footnote Seven Standing.* The plaintiffs, however, are arguably in the position of the hypothetical plaintiff in *Defenders,* — U.S. at ——, 112 S.Ct. at 2142, footnote seven: "[U]nder our caselaw, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an Environmental Impact Statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years." One so situated can proceed "without meeting all the normal standards of redressability and immediacy." *Id.* The plaintiffs can be compared to the person living next to the proposed dam. They are entities whose way of conducting business may be affected by the alleged failures of the federal agencies under the Endangered Species Act. They "cannot establish with any certainty" that any change in the biological opinions would cause the flow rates and spills imposed by the Bonneville Power Administration, or the costs incurred by it in preserving fish, to be altered; but there is the possibility that successful challenges to the consultation process would have an impact upon the preservation of the salmon. Agency action affecting their health may not have immediate effect; the redress sought is not certain in its effect. But Congress has linked agency consultation causally to the continuation of the protected species. Under footnote seven, "[a] procedural right is created, not because it necessarily yields particular outcomes, but because it structures incentives and creates pressures that Congress has deemed important to effective regulation." Cass R. Sunstein, *What's Standing After* Lujan? *Of Citizen Suits, "Injuries," and Article III,* 91 Mich. L.Rev. 163, 226 (1992).

From a narrow economic point of view, the plaintiffs would be as well off if the three listed species were extinct as the plaintiffs would be if the three species were restored to a flourishing condition. That does not mean, however, that the plaintiffs have an economic interest only in the extinction. They have at least as good an interest in the restoration—and maybe a better one. No doubt their public image would be better if they brought the restoration off. Moreover, under the regulatory system governing these hydropower users, they may actually derive some benefit from the health of the rivers and the fish within them. The plaintiffs may thus be partners in the preservation of the species. That general interest does not in itself confer standing; it merely shows that a narrow or cynical understanding of economic interest is not decisive.

Consequently, we cannot find an irremediable conflict of interest between the consumers of hydropower and the fish in the streams. It may be that their posture in litigation would lead to a finding of bad faith. But the district court, while it analogized the plaintiffs to a fox seeking to guard the chicken coop, 822 F.Supp. at 1504, did not find actual bad faith; and absent such a finding we will not impute it.

█ It is an open question whether the plaintiffs must satisfy the prudential "zone of interest" test in addition to the Article III standing requirements. A sister circuit has dispensed with this requirement. *Defenders of Wildlife v. Hodel,* 851 F.2d 1035, 1039 (8th Cir.1988), opinion after remand, 911 F.2d 117 (8th Cir.1990), *rev'd on other grounds sub nom. Lujan v. Defenders of Wildlife,* — U.S. ——, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). We, however, will assume that the requirement must be met. For reasons now to be stated we conclude that it has been met. The critical question is whether the plaintiffs' economic interest is a legal interest protected by the Endangered Species Act. A manufacturer of mink coats has an interest in the preservation of mink, even though his interest is solely economic and he is consuming the mink. The interest of these plaintiffs in the salmon is not as closely tied to the fish as the mink manufacturer's tie to the animal; but nonetheless the plaintiffs do have a genuine economic interest in preserving the salmon and therefore an interest protected by the Endangered Species Act. In the same way a water district was found to have standing under the Clean Air Act, 42 U.S.C. § 7491, to challenge a regulation of the Environmental Protection Agency, even though the purpose of the Clean Air Act was to "enhance the air quality in national parks," 42 U.S.C.

§ 7470(2) and the water district's interest was economic. *Central Arizona Water Conservation Dist. v. United States Environmental Protection Agency,* 990 F.2d 1531 (9th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 94, 126 L.Ed.2d 61 (1993). In the light of this analysis, the plaintiffs have satisfied the three limits on standing categorized as "prudential": they are asserting their own rights; they are not litigating a merely abstract question; and what they complain of falls within the zone of interests protected by the Endangered Species Act. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982).

Standing "is not a concept that can be defined by strict metes and bounds and is not susceptible to facile application"; so litigation about standing often results in a close call. *Banks v. Sec'y of Indian Family and Social Servs.,* 997 F.2d 231, 238 (7th Cir.1993) (applying footnote seven of *Defenders* ). It is urged that our case falls on the side of the line taken by the Eleventh Circuit in *Region 8 Forest Service Timber Purchasers Council v. Alcock,* 993 F.2d 800 (11th Cir.1993), *cert. denied sub nom. Southern Timber Purchasers Council v. Meier,* —— U.S. ——, 114 S.Ct. 683, 126 L.Ed.2d 651 (1994), where timber companies were found to lack standing because there was no injury to "a separate concrete interest." *Id.* at 811. To the contrary, the plaintiffs, as the district court has already determined, have suffered concrete economic injury.

It is argued that if these plaintiffs have a protectable economic interest, then every user of electricity purchased from the plaintiffs has an interest; the image of millions of plaintiffs is evoked. But common sense, a commodity not absent among judges, easily distinguishes the remote, de minimis interest of the person who turns on a light bulb and the interest of these large direct purchasers of hydropower.

The present endangered or threatened status of the species imposes actual costs upon the plaintiffs. They have a real economic stake in changing the status. We see no reason why that economic interest is not convertible into a legal interest. Once that legal interest is recognized, the plaintiffs qualify for standing under footnote seven. That, however, is only the first obstacle in their way to consideration on the merits.

What may be called "the 4–H's"—hydropower, harvesting, habitat, and hatcheries—all play a part in the healthy continuation of the listed species. The history of efforts to protect the salmon in the Northwest is first one of struggle to assure the Indians of harvesting rights under treaties with the United States. Charles F. Wilkinson & Daniel Keith Conner, *The Law of the Pacific Salmon Fishery: Conservation and Allocation of a Transboundary Common Property Resource,* 32 Kan.L.Rev. 17, 46–48 (1983). In more recent times the Northwest Power Act of 1980 was hailed for explicitly requiring the Bonneville Power Administration to give equal priority to the fish and to hydropower and requiring the consumers of power to pay the costs incurred to conserve the fish. 16 U.S.C. § 839b(h)(8)(B). But for a decade the Bonneville Power Administration moved with slowness to recognize its responsibility for the fish. Michael C. Blumm & Andy Simrin, *The Unraveling of the Parity Promise: Hydropower, Salmon, and Endangered Species in the Columbia Basin,* 21 Envtl.L. 657, 703 (1991). The action now taken as to water spills and water flow addresses the most salient feature of the problem within the jurisdiction of the Bonneville Power Administration. But it is plausibly argued that the hatcheries where salmon are artificially propagated are in need of regulation, because hatchery fish compete for food with wild fish; hatchery fish can interbreed with wild fish and dilute the stock; hatchery fish may have lost some desirable genetic properties and may be more subject to disease, all with the final result that hatcheries, instead of preserving a species, can be a source of danger to it. Michael L. Goodman, *Preserving the Genetic Diversity of Salmonid Stocks: A Call for Federal Regulation of Hatchery Programs,* 20 Envtl.L., 110, 135–140 (1990). Resolution of this question is largely a scientific one.

■ It may well be that the plaintiffs would have the greatest difficulty, as the

district court intimated, 822 F.Supp. at 1505, in prevailing on the merits on issues that are largely "scientific disputes," *see Mt. Graham Red Squirrel v. Espy,* 986 F.2d 1568 (9th Cir.1993). But although the plaintiffs have made enough showing to qualify for standing, they have not overcome the other barriers in the way of even reaching the merits on certain of their claims. The district court found their complaint about the 1992 program as it affected hatcheries to be moot; and as consultation was underway in 1993, the alleged deficiency in procedure was not likely to be repeated. 822 F.Supp. at 1507. We are given no reason to hold this finding erroneous.

■ As to habitat, the district court appears to have been of two minds. In its conclusion the district court declared that only the hatchery issue was moot. *Id.* at 1511. But in the course of its opinion, the district court noted that the complaint as to habitat consultation in 1992 was moot and that the issue was not the extraordinary kind which may evade review and yet be repeated and on this ground entitled to judicial consideration. Rather, the district court stated: "[B]ecause these plaintiffs have relied upon generalized claims of ESA violations by defendants within the habitat sector, it is impossible at this time to tell if the generalized failures are of such a short duration that they may evade review." *Id.* at 1507. Nothing in the latter part of the opinion undermines this specific holding of the district court. Accordingly, we find it to be controlling, and the issue moot and nonjusticiable.

The district court, however, did appear to believe that the alleged lack of comprehensive review was an issue that, although moot for 1992, might be of the extraordinary character that could be repeated and evade review. *Id.* at 1508. This issue is presented forcefully by Pacific Northwest Generating Cooperative, which argues that the biological opinion of the National Marine Fishery Service concerning 1992 hydropower operations system violated the Endangered Species Act "by addressing only hydropower and not comprehensively addressing all activities adversely affecting the listed species. Consequently, hydropower operations were dra-

matically altered at great expense and with only dubious benefit to the listed species, while other effects of decline were ignored."

■ On analysis, a portion of this claim goes beyond the basis for the plaintiffs' standing because it focuses on the increases in cost to hydropower operations. The plaintiffs are entitled to standing because preservation of the salmon will, in the long run, reduce their cost. But the plaintiffs are not entitled to standing simply to complain about the additional cost imposed on hydropower. Nothing in the Endangered Species Act confers a cause of action for that purpose.

The remainder of the claim that comprehensive consultation was not undertaken may be disaggregated as follows: As far as the habitat and hatchery consultations are concerned, as we have found these claims to be moot, a claim that hatchery and habitat should have been included in a comprehensive consultation is equally moot. Of the four H's, what remains is a claim that harvest should have been considered. Failure to look at the harvest in-river or in the Pacific is the sharp edge of the charge that consultation was not comprehensive. We, therefore, address this claim on the merits.

■ The allegation of the plaintiffs now to be considered is that the relevant federal defendants are permitting the take of the three listed species because they are permitting the harvesting of salmon in the rivers and in the ocean, and the fisheries cannot distinguish visually between the listed species and the unlisted species. Inevitably, it appears, some endangered fish will be caught in the river and ocean fisheries.

The defendants note that the Endangered Species Act permits a take of endangered species that is "incidental" to a permitted activity. 16 U.S.C. § 1536(b)(4). The district court accepted the defendants' position that the authorized take of the listed species was incidental to the permitted salmon harvesting. The plaintiffs strenuously argue that purposeful fishing which cannot distinguish among the salmon taken should not be characterized as merely "incidental" taking of the endangered species. To the contrary, it cannot be believed that Congress intended

to ban all salmon fishing in the Columbia and Snake Rivers and in the Pacific Ocean whenever one salmon stock, indistinguishable by sight, became endangered. In common sense and in terms of the statute, the few endangered salmon constitute "incidental" take when they are captured.

■■■ The final argument of the plaintiffs is that the Endangered Species Act prohibits trade or transportation of members of an endangered species, 16 U.S.C. § 1538(a)(1), and that the captured endangered salmon are routinely transported and traded as part of the mass of salmon harvested. The plaintiffs also note that by regulation any permission to take an endangered species requires provisions designed to prevent the trade or transport of the endangered species when taken. *Id.* at 1536b(4)(C)(ii). To these contentions the defendants make a short answer: it is impossible to enforce the trade and transport law as to the few forbidden fish harvested in the ocean or rivers. Impossibility in our view is sufficient answer. It was not the intention of the statute to ban all salmon fishing or to place upon the federal defendants an enforcement burden that no one could accomplish.

Holding that the harvesting claims are founded on a misinterpretation of the Endangered Species Act and that the hatchery, habitat, and remainder of the comprehensive consultation claims are moot, we **AFFIRM** the grant of summary judgment to the defendants.