990 F.2d 1531
 36 ERC 1177, 61 USLW 2627, 143
P.U.R.4th 110,
23 Envtl. L. Rep. 20,678
 CENTRAL ARIZONA WATER CONSERVATION DISTRICT, Central Arizona
Irrigation and Drainage District, Maricopa-Stanfield
Irrigation & Drainage District, New Magma Irrigation &
Drainage District, and Harquahala Valley Irrigation
District, Petitioners,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent,
Salt River Project and Power District, Grand Canyon Trust,
and the Wilderness Society, Respondents-Intervenors.
 No. 91-70731.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 13, 1993.
Decided March 25, 1993.
 
 Marvin S. Cohen, Sacks, Tierney & Kasen, Leslie A. McCarthy (on brief), Phoenix, AZ, for petitioners.
 Scott A. Schachter, U.S. Dept. of Justice, Vicki L. Patton, U.S. E.P.A., Washington, DC, for respondent.
 Patrick M. Raher, Hogan & Hartson, Washington, DC, for respondents-intervenors.
 Beryl I. Dulsky, Asst. Atty. Gen., Phoenix, AZ, for amicus curiae.
 Appeal from the United States Environmental Protection Agency.
 Before: ALDISERT,* GOODWIN, and FLETCHER, Circuit Judges.
 GOODWIN, Circuit Judge:
 
 
 1
 Petitioners Central Arizona Water Conservation District ("CAWCD") and four irrigation districts[1] (collectively "Petitioners" or the "Districts") challenge an Environmental Protection Agency ("EPA") Final Rule which requires a 90% reduction in sulfur dioxide (SO sub2 ) emissions at the Navajo Generating Station ("NGS") in order to improve winter average visibility in the Grand Canyon National Park ("Grand Canyon").
 
 
 2
 Petitioners argue (1) that, because the Final Rule seeks to regulate "regional haze" when EPA has yet to promulgate Phase II implementing regulations addressing regional haze, EPA exceeded the scope of its regulatory authority by issuing the Final Rule, and (2) that the Final Rule constitutes arbitrary and capricious agency action. In addition to responding to Petitioners' substantive criticisms, EPA asserts that Petitioners lack standing to bring this challenge.
 
 
 3
 The Final Rule was issued by EPA under 42 U.S.C. §§ 7410(c)(1), 7491, and is directly appealable to this court under 42 U.S.C. § 7607(b)(1). Petitioners do have standing to bring this challenge. We hold, however, that EPA acted within its statutory and regulatory authority when it promulgated the Final Rule, and that EPA has not acted arbitrarily and capriciously.
 
 I. BACKGROUND
 
 4
 This case involves regulations promulgated by EPA in an attempt to remedy, at least partially, visibility impairment at the Grand Canyon. In a final rule entitled "Approval and Promulgation of Implementation Plans: Revision of the Visibility FIP for Arizona," 56 Fed.Reg. 50,172 (1991) (codified at 40 C.F.R. § 52) ("Final Rule"), EPA required a 90% reduction in SO sub2 emissions at NGS, a power plant situated approximately twelve miles from the Grand Canyon, near Page, Arizona. The Final Rule limits SO sub2 emissions from NGS to 0.10 pound per million British thermal units (lb/MMBtu), with an estimated 7% winter average visibility improvement in the Grand Canyon. The estimated cost of the improvement, following an initial capital cost estimated at $430 million, is $89.6 million per year.
 
 
 5
 The Salt River Project ("SRP"), a respondent-intervenor in this case,[2] is the operating agent of NGS. NGS is jointly owned by SRP, the U.S. Department of Interior, Bureau of Reclamation ("BOR"), Los Angeles Department of Water and Power, Arizona Public Service Co., Nevada Power Co. and Tucson Gas & Electric Co.[3] Petitioners are water districts that obtain electricity to pump their water primarily from NGS. They acknowledge that they are not owners of NGS, but nonetheless claim an economic interest in the Final Rule. CAWCD claims that it will be required, due to its contractual relationship with the BOR, to repay the major portion of the BOR's 24.3% share of the costs of installing and maintaining the emission controls required by the Final Rule.
 
 A. Regulatory Framework
 
 6
 1. The Clean Air Act, Visibility Impairment, and the Grand Canyon
 
 
 7
 In 1977, Congress substantially amended the Clean Air Act (the "Act"). Included in the 1977 amendments was section 169A, 42 U.S.C. § 7491, which declared "as a national goal the prevention of any future, and the remedying of any existing, impairment of visibility in mandatory class I Federal areas which impairment results from manmade air pollution." 42 U.S.C. § 7491(a)(1). Congress required EPA to promulgate regulations to assure "reasonable progress toward meeting th[is] national goal." 42 U.S.C. § 7491(a)(4). EPA was further directed to require each state with a class I Federal area to revise its state implementation plan ("SIP") "to contain such emission limits, schedules of compliance and other measures as may be necessary to make reasonable progress toward meeting the national goal." 42 U.S.C. § 7491(b)(2). Measures for achieving "reasonable progress" generally include best available retrofit technology ("BART")[4] and a long-term strategy. 42 U.S.C. §§ 7491(b)(2)(A), (B). If an individual state fails to fulfill its obligations under the Act, EPA is directed to take such measures as are required to achieve "reasonable progress" pursuant to a federal implementation plan ("FIP") under section 110(c) of the Act. 42 U.S.C. § 7410(c)(1).
 
 
 8
 The Act defines class I Federal areas as international parks, national wilderness areas or memorial parks which exceed 5,000 acres in size, and national parks which exceed 6,000 acres in size. 42 U.S.C. § 7472(a). The Grand Canyon has been classified as a class I Federal area. See 44 Fed.Reg. 69,122 (1979). Congress recorded its concern with the visibility impairment at the Grand Canyon caused by NGS. See H.R.Rep. No. 294, 95th Cong., 1st Sess. 203-04 (1977) U.S.Code Cong. & Admin.News pp. 1077, 1282, 1283.
 
 2. EPA's 1980 Regulations
 
 9
 In 1980, EPA promulgated visibility regulations under section 169A of the Act. 45 Fed.Reg. 80,084 (1980) (codified at 40 C.F.R. §§ 51.300-.307). The regulations adopted a "phased approach to visibility protection." Id. at 80,085. Phase I was directed at controlling visibility impairment "that can be traced to a single existing stationary facility or small group of existing stationary facilities." Id. EPA refers to this type of impairment as "reasonably attributable" impairment. 45 Fed.Reg. 34,762, 34,779 (1980) (codified at 40 C.F.R. § 51). EPA deferred addressing other types of impairment such as "regional haze" for future phases due to the heightened complexity and the scientific and technical limitations inherent in attempts to identify, measure, and control such broadscale visibility impairment. See 45 Fed.Reg. at 80,086; see also id. at 80,085 (defining regional haze as "widespread, regionally homogeneous haze from a multitude of sources which impairs visibility in every direction over a large area").
 
 
 10
 Generally, EPA's "Phase I" regulations require affected states to coordinate the development of SIPs with the appropriate Federal land managers, to develop programs to assess and remedy visibility impairment from new and existing sources, and to develop a long-term strategy to assure reasonable progress toward section 169A's national visibility goal. See 40 C.F.R. §§ 51.300-.307. The regulations specifically require states to identify those existing sources "which may reasonably be anticipated to cause or contribute" to any visibility impairment which is "reasonably attributable to that existing stationary facility." 40 C.F.R. § 51.302(c)(4)(i). Once the source is identified, the affected state is required to take such measures as are required to attain "reasonable progress"; such measures generally include determination of emissions limitations for that source under BART and the development of a long-term strategy. 40 C.F.R. §§ 51.302(c)(1), (2).
 
 
 11
 The regulations define the term "visibility impairment" as "any humanly perceptible change in visibility (visual range, contrast, coloration) from that which would have existed under natural conditions." 40 C.F.R. § 51.301(x). The term "reasonably attributable" is defined as "attributable by visual observation or any other technique the State deems appropriate." 40 C.F.R. § 51.301(s). The states, or EPA under § 7410(c), thus have broad discretion in determining how and whether impairment may be attributed to an individual source. See 45 Fed.Reg. at 80,094, 80,085.
 
 
 12
 B. Prior Proceedings and the Rulemaking History
 
 
 13
 In its implementation of Phase I, EPA required all states containing class I Federal areas to submit revised visibility SIPs within a nine-month period. Arizona was one of thirty-five states failing to submit a revised SIP to EPA. In 1982, the Environmental Defense Fund and other environmental groups brought a citizen suit against EPA to compel performance of the agency's nondiscretionary duty under 42 U.S.C. § 7410(c)(1)(A) to promulgate visibility FIPs when states fail to submit SIPs pursuant to the 1980 regulations. See EDF v. Reilly, No. C82-6850-RPA (N.D.Cal. Apr. 20, 1984). The parties reached a settlement agreement which the court approved in an April 20, 1984 consent decree. This consent decree required EPA to review existing SIPs for deficiencies and allow states to cure those deficiencies. If states remained deficient, the consent decree required EPA to issue visibility FIPs.
 
 
 14
 The Department of Interior subsequently certified the existence of visibility impairment in all class I Federal areas, and specifically declared NGS as a probable source of impairment at the Grand Canyon. Following this certification, the National Park Service ("Park Service") conducted the Winter Haze Intensive Tracer Experiment ("WHITEX"), a winter visibility attribution study. In part, WHITEX involved the release from NGS of a unique "tracer" gas, CD sub4 ; because CD sub4 is not found in the ambient air, its use "fingerprinted" NGS emissions when detected downwind.
 
 
 15
 In November 1987, EPA disapproved the SIPs of twenty-nine states, including Arizona, for failing to comply with the visibility regulations. See 52 Fed.Reg. 45,132, 45,133 (1987) (codified at 40 C.F.R. §§ 52, 81). Over the next few years, EPA further investigated visibility impairment at Grand Canyon and other class I Federal areas. While acting on many of the areas, EPA delayed action on the Grand Canyon to allow the Park Service time to analyze the data obtained from the WHITEX study. The Park Service issued an April 1989 draft report which attributed to NGS 70% of the sulfates in the Grand Canyon during the WHITEX experiment period. See William Malm et al., National Park Service Report on the Winter Haze Intensive Tracer Experiment, Draft Final Report (Apr. 7, 1989).
 
 
 16
 Relying on the Park Service's April 1989 draft report, EPA preliminarily attributed to NGS several episodes of winter-time visibility impairment at the Grand Canyon. See 54 Fed.Reg. 36,948, 36,951 (1989) (codified at 40 C.F.R. § 52). EPA solicited public comment on the merits of its preliminary attribution finding, and began the informal rulemaking process to determine the appropriate action to be taken. Id. In December 1989, the Park Service issued its final report on WHITEX. See William Malm et al., National Park Service Report on the Winter Haze Intensive Tracer Experiment, Final Report (Dec. 4, 1989).
 
 
 17
 SRP and others, including Petitioners, submitted comments severely criticizing the analyses, methodologies, and conclusions of the Park Service's reports. In response to the concerns raised about the Park Service's analysis of the WHITEX data, the National Research Council of the National Academy of Sciences ("NAS") was asked to evaluate the Park Service's WHITEX report and the other scientific evidence relevant to EPA's preliminary attribution. In its October 1990 report, the NAS confirmed that "at some times during the study period, NGS contributed significantly to haze" in the Grand Canyon. National Research Council, Haze in the Grand Canyon: An Evaluation of the Winter Haze Intensive Tracer Experiment 3, 37 (1990) [hereinafter Haze in the Grand Canyon ]. NAS cautioned, however, that "aspects of the WHITEX data analysis preclude a quantitative determination of the exact fraction of the Grand Canyon haze problem that is attributable to NGS. These aspects are primarily related to problems with implementation and interpretation of multiple linear regression models." Id. at 37. Still, NAS acknowledged that Congress did not "require EPA to show a precise relationship between a source's emissions and all or a specific fraction of the visibility impairment within a Class I area." Id. at 5, 37.
 
 
 18
 SRP sponsored its own monitoring study in the winter of 1990--the Navajo Generating Station Visibility Study ("NGSVS")--to investigate the sources of visibility impairment in the Grand Canyon and to determine what improvement in visibility would result from a reduction of SO sub2 emissions at NGS. The NGSVS data indicated that controlling SO sub2 emissions from NGS would at most result in a 2% improvement in the winter seasonal average standard visual range. While detailing some episodes of visibility impairment attributable to NGS, the NGSVS report generally found that "the NGS was only part of a regional problem and that it was not the dominant contributor of sulfates." Sonoma Technology Inc., Navajo Generating Station Visibility Study 2-11 (L. Willard Richards et al. eds., 1991).
 
 
 19
 In February 1991, EPA proposed to revise the FIP for Arizona to include emission limits under BART to address wintertime visibility impairment at the Grand Canyon reasonably attributable to NGS. See 56 Fed.Reg. 5,173 (1991) (codified at 40 C.F.R. § 52). EPA solicited public comment on four possible regulatory options, and proposed one of those options--to require as BART for NGS a 70% continuous SO sub2 emission limitation, determined on a thirty-day rolling average, to be phased-in between 1995 and 1999. Id. at 5,183-84. After a public comment period of over nine weeks, senior EPA policy officials met with the NGS owners, representatives of the State of Arizona, and certain environmental groups, including the Grand Canyon Trust and the EDF, to explore further additional control options which might produce a pareto optimal solution, more environmentally protective and economically efficient.[5] These meetings resulted in a "memorandum of understanding" which recommended that EPA adopt a regulatory approach designed to achieve a greater degree of visibility improvement in the Grand Canyon at lower cost than the proposal published by EPA in February 1991. EPA published the proposal outlined in the memorandum of understanding and reopened the public comment period. See 56 Fed.Reg. 38,399, 38,401 (1991) (codified at 40 C.F.R. § 52). EPA received twenty-one comments during this supplemental period, eighteen of which supported the new proposal. See 56 Fed.Reg. at 50,177.
 
 
 20
 In the Final Rule, dated October 3, 1991, EPA issued its final determination that certain visibility impairment episodes at the Grand Canyon were "traceable to NGS and that NGS is a dominant contributor to certain visibility impairment episodes," and promulgated revisions to the Arizona visibility FIP to address the impairment. Id. The revisions adopted a regulatory approach consistent with the memorandum of understanding's proposal, reducing SO sub2 emissions 90% to a level of 0.10 lb/MMBtu. Id. EPA determined that this approach would more adequately achieve "reasonable progress" toward the national visibility goal under section 169A(b)(2) of the Act, 42 U.S.C. § 7491(b)(2), than would the alternative provided by BART analysis. See 56 Fed.Reg. at 50,177. As required by section 307(d) of the Act, EPA's action was "accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period." 42 U.S.C. § 7607(d)(6)(B). EPA issued its responses in the regulation itself and in a supplementary ninety-one page document entitled "Response to Public Comments: Proposed Revisions to Arizona Visibility FIP for Navajo Generating Station" [hereinafter Response to Public Comments ].
 
 II. STANDING
 
 21
 First, as a threshold jurisdictional matter, EPA challenges whether the Districts have standing to bring this action. We find that the Districts do have standing.
 
 A. Constitutional Standing
 
 22
 The Supreme Court recently outlined the three elements of the "irreducible constitutional minimum of standing" in Lujan v. Defenders of Wildlife, --- U.S. ----, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992):
 
 
 23
 First, the plaintiff must have suffered an "injury in fact"--an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.' " Second, there must be a causal connection between the injury and the conduct complained of--the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."
 
 
 24
 Id. --- U.S. at ----, 112 S.Ct. at 2136 (footnote, citations omitted; ellipses in original). Justice Scalia elaborated that "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." Id. --- U.S. at ----, 112 S.Ct. at 2137 (quoting Allen v. Wright, 468 U.S. 737, 758, 104 S.Ct. 3315, 3328, 82 L.Ed.2d 556 (1984)).
 
 1. Injury in Fact
 
 25
 The Districts' claimed injury is an economic one: CAWCD claims it is contractually required to repay much of BOR's 24.3% share of the costs of installing and maintaining emission controls at NGS as required by the Final Rule. Pecuniary injury is clearly "a sufficient basis for standing." See Fair v. EPA, 795 F.2d 851, 853-54 (9th Cir.1986) (citing cases). But while pecuniary or economic injury is generally a legally protected interest, the "injury in fact" test " 'requires that the party seeking review be himself among the injured.' " Lujan, --- U.S. at ----, 112 S.Ct. at 2137 (quoting Sierra Club v. Morton, 405 U.S. 727, 734-35, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972)). That party's injury must be (a) concrete and particularized, and (b) actual or imminent, and not conjectural or hypothetical. Id. --- U.S. at ----, 112 S.Ct. at 2136.
 
 
 26
 EPA argues that the owners of NGS are the ones directly aggrieved by the Final Rule, and that the indirect economic harm that the Districts may suffer as a result of their financial obligation to one of NGS's owners is too attenuated an interest to provide them with standing to bring this challenge. EPA claims the Districts' injury is purely speculative because: (1) CAWCD concedes it will attempt to pass on increased costs caused by the Final Rule to its water users and taxpayers (including the four petitioning irrigation districts); and (2) CAWCD has failed to demonstrate that BOR will in fact have to pay a portion of any existing compliance costs,[6] or that CAWCD will be required under contract to reimburse BOR for a portion of those costs assuming they exist. Thus, EPA argues, the Districts' economic injury is too indirect, speculative, and hypothetical to provide them with standing.
 
 
 27
 We conclude that CAWCD's economic injury is sufficiently concrete and imminent to accord it standing to litigate this action. The Districts' claimed injury is by no means "a general or amorphous harm," National Wildlife Fed'n v. Burford, 871 F.2d 849, 852 (9th Cir.1989), nor is it a mere generalized grievance. See Lujan, --- U.S. at ----, 112 S.Ct. at 2143. While the extent of CAWCD's economic harm is not readily determinable, the record reveals that the Final Rule will likely cause Petitioners some amount of pecuniary harm given their obligation to repay BOR's share of the costs imposed by the Final Rule. Neither the sale of marketable allowances nor the possibility of passing on increased costs to consumers undermine the Districts' showing of the required "actual or threatened injury." Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); Competitive Enter. Inst. v. NHTSA, 901 F.2d 107, 112 (D.C.Cir.1990).
 
 2. Causation and Redressability
 
 28
 In addition to the injury in fact requirement, the Districts must prove causation and redressability, i.e., that their alleged economic injury is fairly traceable to EPA's challenged action, and that the relief requested is likely to redress that injury. Lujan, --- U.S. at ----, 112 S.Ct. at 2136. EPA argues that since the Districts' alleged economic injury flows from obligations under the BOR/CAWCD agreement, the injury is not caused by or fairly traceable to the challenged agency action. This argument misses the point. While CAWCD's contractual obligations may provide the basis for its economic liability for the increased costs imposed by the Final Rule, that hardly means that the Final Rule itself is not the direct cause of that liability. Further, the involvement of an intermediate third-party here does not undermine the Districts' causation argument since "the government's action [is] substantially likely to cause the petitioners' injury despite the presence of intermediary parties." Competitive Enter., 901 F.2d at 114 (consumer organization has standing to challenge NHTSA fuel economy standards on grounds that organization members would be hindered in their ability to purchase larger vehicles). Finally, the Districts' economic injury is likely to be redressed by a favorable decision since elimination of the Final Rule would necessarily eliminate the increased financial burden the rule causes.
 
 B. Prudential Standing
 
 29
 In addition to the constitutional standing requirements, Petitioners must also prove that their asserted interest is "within the zone of interests protected by" the Clean Air Act. See, e.g., Fair v. EPA, 795 F.2d at 854.
 
 
 30
 EPA contends that the Districts' economic injury is not within the zone of interests of the Act's visibility provisions, which are designed to "preserve, protect, and enhance the air quality in national parks." 42 U.S.C. § 7470(2). EPA's argument ignores the fact that "the zone of interest test is 'not meant to be particularly demanding.' " National Wildlife Fed'n v. Burford, 871 F.2d at 852 (quoting Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987)). As the Supreme Court clarified in Clarke:
 
 
 31
 In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.
 
 
 32
 479 U.S. at 399, 107 S.Ct. at 757. Under this permissive standard, the Districts' economic injury sufficiently falls within the "zone of interests" protected by the visibility provisions of the Act. Section 169A of the Act requires the Administrator to consider "the costs of compliance" in setting standards to achieve reasonable progress towards the national visibility goal. 42 U.S.C. § 7491(g)(1). As entities required to pay those costs of compliance, the Districts' interests cannot reasonably be described as "marginally related to or inconsistent with" the purposes of the Act.
 
 
 33
 We therefore conclude that Petitioners have standing to bring this challenge.
 
 III. STANDARD OF REVIEW
 
 34
 The appropriate judicial review of the regulations at issue here is provided for in section 307(d) of the Act, 42 U.S.C. § 7607(d). In relevant part, section 307(d)(9) provides that a reviewing court may reverse any action of the Administrator found to be
 
 
 35
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 
 
 36
 . . . . .
 
 
 37
 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or
 
 
 38
 (D) without observance of procedure required by law, if (i) such failure to observe such procedure is arbitrary or capricious, (ii) the requirement of paragraph (7)(B) has been met, and (iii) the condition of the last sentence of paragraph (8) is met.
 
 
 39
 42 U.S.C. §§ 7607(d)(9)(A), (C)-(D).
 
 
 40
 Paragraph (7)(B) generally limits judicial review to procedural objections "raised with reasonable specificity during the period for public comment." Id. at § 7607(d)(7)(B). But paragraph (7)(B) does provide for mandatory reconsideration of the rule by the agency if an objecting party can "demonstrate to the Administrator" that (1) it was "impracticable" to properly raise a given procedural objection, and (2) the "objection is of central relevance to the outcome of the rule." Id.[7] The last sentence of paragraph (8) further provides:
 
 
 41
 In reviewing alleged procedural errors, the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made.
 
 
 42
 42 U.S.C. § 7607(d)(8).
 
 
 43
 Review of EPA's actions under section 307(d) of the Act is guided by the appropriate deference given to an agency's interpretation of the statute Congress has entrusted it to administer. Chevron U.S.A. Inc. v. NRDC, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984) (where the Clean Air Act is either "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute"). "Deference also guides our review of the Administrator's interpretation of EPA regulations if the interpretation is not unreasonable." Citizens for Clean Air v. EPA, 959 F.2d 839, 844 (9th Cir.1992); see also Hawaiian Elec. Co. v. EPA, 723 F.2d 1440, 1447 (9th Cir.1984) ("[W]hen EPA is interpreting its own regulations, it is entitled to even more deference."). Moreover, the Supreme Court has advised that "a reviewing court must generally be at its most deferential" when the agency is "making predictions, within its area of special expertise, at the frontiers of science." Baltimore Gas & Elec. Co. v. NRDC, Inc., 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983). In such situations, this court is to "deter to the agency's interpretation of equivocal evidence, so long as it is reasonable." NRDC, Inc. v. EPA, 902 F.2d 962, 968 (D.C.Cir.1990), vacated, in part, dismissed, 921 F.2d 326 (D.C.Cir.), certs. dismissed, 498 U.S. 1075, 111 S.Ct. 806, 112 L.Ed.2d 865, cert. denied, 498 U.S. 1082, 111 S.Ct. 952, 112 L.Ed.2d 1040 (1991).
 
 
 44
 While this court should not defer to the agency where it "simply has not exercised its expertise," Public Citizen Health Research Group v. Tyson, 796 F.2d 1479, 1505 (D.C.Cir.1986),[8] courts are "extremely deferential to administrative agencies in cases involving technical rulemaking decisions." New York v. Reilly, 969 F.2d 1147, 1152 (D.C.Cir.1992); see also id. at 1150-51 ("We are particularly deferential when reviewing agency actions involving policy decisions based on uncertain technical information."); Tyson, 796 F.2d at 1505 ("[A]s long as Congress delegates power to an agency to regulate on the borders of the unknown, courts cannot interfere with reasonable interpretations of equivocal evidence.").
 
 IV. DISCUSSION
 
 45
 A. EPA's Statutory Authority to Promulgate the Final Rule
 
 
 46
 Petitioners argue that in promulgating the Final Rule, EPA acted "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" under 42 U.S.C. § 7607(d)(9)(C). Petitioners claim that the Final Rule regulates "regional haze" when EPA's own regulations expressly defer regulation of that type of visibility impairment until future phases. See 45 Fed.Reg. at 80,086. We conclude that the Final Rule was legitimately promulgated under Phase I regulations directed at "reasonably attributable" visibility impairment.
 
 
 47
 Petitioners rely on Vermont v. Thomas, 850 F.2d 99 (2d Cir.1988), where EPA reaffirmed that it was without authority to regulate "regional haze" and that measures addressing that type of impairment are outside the scope of EPA's jurisdiction. This reliance is misplaced. In Thomas, the state of Vermont submitted to EPA an SIP which "proposed a federally enforceable 'long-term strategy' to combat the effects of regional haze" at the Lye Brook National Wilderness Area. Id. at 101. The court held that without EPA rulemaking addressing regional haze, the state's regional haze measures were "outside the scope" of EPA's statutory and regulatory authority. Id. at 103-04. Here, EPA properly promulgated its Final Rule under its Phase I regulations directed at "reasonably attributable" impairment.[9] Thomas is thus distinguishable since it involved a direct and explicit attempt to regulate "regional haze."
 
 
 48
 EPA has acknowledged that "NGS is not the only source of visibility impairment" at the Grand Canyon, 56 Fed.Reg. at 50,177, and that regional haze also adversely affects visibility there. Response to Public Comments at 23. Nonetheless, these mere facts hardly mean that EPA is without statutory authority to remedy the impairment attributable to NGS. Even if the Final Rule addresses only a small fraction of the visibility impairment at the Grand Canyon, EPA still has the statutory authority to address that portion of the visibility impairment problem which is, in fact, "reasonably attributable" to NGS. Congress mandated an extremely low triggering threshold, requiring the installment of stringent emission controls when an individual source "emits any air pollutant which may reasonably be anticipated to cause or contribute to any impairment of visibility" in a class I Federal area. 42 U.S.C. § 7491(b)(2)(A). The National Academy of Sciences correctly noted that Congress has not required ironclad scientific certainty establishing the precise relationship between a source's emission and resulting visibility impairment:
 
 
 49
 The phrase "may reasonably be anticipated" suggests that Congress did not intend to require EPA to show a precise relationship between a source's emissions and all or a specific fraction of the visibility impairment within a Class I area. Rather, EPA is to assess the risk in light of policy considerations regarding the respective risks of overprotection and underprotection.
 
 
 50
 Haze in the Grand Canyon at 5.
 
 
 51
 Acting in place of the state of Arizona pursuant to an FIP under 42 U.S.C. § 7410(c), EPA "stands in the shoes of the defaulting State, and all of the rights and duties that would otherwise fall to the State accrue instead to EPA." 54 Fed.Reg. at 36,952. EPA is therefore granted broad discretion in determining whether visibility impairment is "reasonably attributable" to a given source. See 40 C.F.R. § 51.301(s) (defining "reasonably attributable" as "attributable by visual observation or any other technique the State deems appropriate") (emphasis added). This broad, all-inclusive definition of the term "reasonably attributable" directly refutes Petitioners' argument that EPA is limited to addressing visibility impairment caused by a noticeable plume that is directly traceable to a given source through the use of visual observation or simple monitoring techniques.
 
 
 52
 We conclude that the technical, scientific record more than adequately supports EPA's reasonable conclusion that visibility impairment in the Grand Canyon is "reasonably attributable" to NGS. We defer to the agency's reasonable interpretation of its own regulations and statutory mandate. Its interpretation is most certainly consonant with Congress's apparent intent. For instance, in his introduction of the Conference Committee report to the House, Representative Henry Waxman stated:
 
 
 53
 Protecting the Grand Canyon simply must become a normal business practice of the American industry ... [T]he Four Corners and Navajo powerplants can expect to retrofit with additional pollution controls to limit the vast deterioration in visibility which their plumes have caused.
 
 
 54
 Impairment of visibility is the single most apparent impact air pollution has on the environment. It is our intent that aggressive steps be taken to reduce this eyesore which has defaced our grand vistas in the West.
 
 
 55
 123 Cong.Rec. 27,076 (1977) (statement of Rep. Waxman). EPA's interpretation of its authority to determine whether visibility impairment is "reasonably attributable" to NGS is entitled to deference from this court since the agency's " 'choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute,' " which this court " 'should not disturb' " since it does not appear " 'from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.' " Chevron, 467 U.S. at 845, 104 S.Ct. at 2783 (quoting United States v. Shimer, 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)).
 
 
 56
 B. The Final Rule as the Product of "Reasoned Decisionmaking"
 
 
 57
 Petitioners proffer various arguments that the Final Rule is not the product of "reasoned decisionmaking." They assert that EPA has acted arbitrarily and capriciously by overestimating the improvements in visibility expected from the Final Rule's emission controls at NGS, by purportedly failing to address criticisms to the scientific data and analyses on which it relied, and by allegedly ignoring certain evidence while placing undue reliance on other evidence. At bottom, however, Petitioners' real complaint appears to be that the Final Rule will most likely lead to minimal visibility improvement at the Grand Canyon while imposing a substantial financial burden on them. Nonetheless, we find unsupported Petitioners' legal claim that EPA acted arbitrarily and capriciously in promulgating the Final Rule. The Final Rule makes "reasonable progress" toward the national goal of remedying visibility impairment at the Grand Canyon, and is the product of reasoned decisionmaking.
 
 
 58
 1. The Final Rule as "Reasonable Progress" toward the National Goal of Remedying Visibility Impairment at the Grand Canyon
 
 
 59
 In reviewing whether the agency's action in promulgating the Final Rule was arbitrary and capricious, this court "is not to substitute its judgment for that of the agency." State Farm, 463 U.S. at 43, 103 S.Ct. at 2866. Instead, we inquire whether the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.' " Id. (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)). Our review is limited to "whether the agency considered the relevant factors and whether there has been a clear error of judgment." NRDC, Inc. v. EPA, 966 F.2d 1292, 1297 (9th Cir.1992) (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). In this case, the relevant factors are provided by Congress's definition of "reasonable progress" in 42 U.S.C. § 7491(g)(1). Additionally, as the D.C. Circuit recently noted in discussing a similar provision of the Act, "[b]ecause Congress did not assign the specific weight the Administrator should accord each of these factors, the Administrator is free to exercise his discretion in this area." New York v. Reilly, 969 F.2d at 1150 (discussing 42 U.S.C. § 7411(a)(1)(C)).[10]
 
 
 60
 a. The "Reasonable Progress" Provisions
 
 
 61
 In the Act, Congress directed EPA to promulgate regulations to assure "reasonable progress toward meeting the national goal" of preventing future, and remedying existing visibility impairment in Class I federal areas like the Grand Canyon. See 42 U.S.C. §§ 7491(a)(4), (a)(1), (b)(2), (b)(2)(B). Congress chose not to define the term "reasonable progress," but instead set forth several factors for the agency to consider:
 
 
 62
 In determining reasonable progress there shall be taken into consideration the costs of compliance, the time necessary for compliance, and the energy and nonair quality environmental impacts of compliance, and the remaining useful life of any existing source subject to such requirements[.]
 
 
 63
 42 U.S.C. § 7491(g)(1). In promulgating the Final Rule, EPA relied on the "reasonable progress" provisions as its statutory authority. See 56 Fed.Reg. at 50,177 (noting that EPA adopts the "reasonable progress" provisions of section 169A(b)(2), 42 U.S.C. § 7491(b)(2) as the "legal rationale" for the Final Rule).
 
 
 64
 Generally, the Act and its regulations require the application of BART once it has been determined that visibility impairment is "reasonably attributable" to an existing source like NGS. See 42 U.S.C. § 7491(b)(2); 40 C.F.R. § 51.302(c)(4)(i). Under the unique circumstances of this case, however, EPA chose not to adopt the emission control limits indicated by BART analysis, but instead to adopt an emission limitations standard that would produce greater visibility improvement at a lower cost. Congress's use of the term "including" in § 7491(b)(2) prior to its listing BART as a method of attaining "reasonable progress" supports EPA's position that it has the discretion to adopt implementation plan provisions other than those provided by BART analyses in situations where the agency reasonably concludes that more "reasonable progress" will thereby be attained. Since the Act itself is ambiguous on the specific issue, we apply the Supreme Court's deferential standard from Chevron and hold that the agency's reliance on the "reasonable progress" provisions is a "permissible construction of the statute," 467 U.S. at 843, 104 S.Ct. at 2782, since "reasonable progress" is the overarching requirement that implementation plan revisions under 42 U.S.C. § 7491(b)(2) must address.
 
 
 65
 b. EPA Reasonably Considered the Relevant Factors
 
 
 66
 The administrative record reveals that EPA adequately considered the relevant factors in promulgating the Final Rule.[11] Petitioners' essential argument does not claim that EPA failed to consider the relevant factors, but instead contends that EPA erred in its consideration of those factors. This court is not to substitute Petitioners' judgment, or its own, for that of EPA, as long as the agency's interpretation is reasonable. In fact, this is just the type of case in which the Supreme Court has stated that judicial review should "be at its most deferential," because the agency is "making predictions, within its area of special expertise, at the frontiers of science." Baltimore Gas & Elec. Co., 462 U.S. at 103, 103 S.Ct. at 2255. We therefore find that the agency's interpretation of the evidence, and its weighing of the relevant factors, are reasonable, and that the Final Rule is the product of "reasoned decisionmaking."
 
 
 67
 2. Petitioners Have Failed to Demonstrate that EPA Acted in an Arbitrary and Capricious Manner
 
 
 68
 Petitioners argue that EPA relied on discredited elements of a seriously flawed study, failed to refute significant criticisms which undercut the basis for EPA's improvement estimate, and refused to consider highly relevant evidence which contradicted its estimate. They conclude that EPA has acted arbitrarily and capriciously. We reject these arguments.
 
 
 69
 The allegedly discredited study on which EPA relied was the Park Service's analysis of the WHITEX data. The record reveals, however, that EPA acknowledged the limitations of the Park Service report (even seeking and obtaining NAS comment on it), and did not rely solely upon that report's conclusions. As discussed supra, EPA's determination that visibility impairment at the Grand Canyon is "reasonably attributable" to emissions at NGS was eminently reasonable and adequately supported by a substantial body of scientific and technical evidence in the record. Further, as the D.C. Circuit noted in NRDC v. EPA:
 
 
 70
 "The Administrator may apply his expertise to draw conclusions from suspected, but not completely substantiated, relationships between facts, from trends among facts, from theoretical projections from imperfect data, from probative preliminary data not yet certifiable as 'fact,' and the like."
 
 
 71
 902 F.2d at 968 (quoting Ethyl Corp. v. EPA, 541 F.2d 1, 28 (D.C.Cir.) (en banc ), cert. denied, 426 U.S. 941, 96 S.Ct. 2662, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976)). While this court must still ensure that "the agency has made a reasoned decision based on 'reasonable extrapolations from some reliable evidence,' " id. (quoting NRDC, Inc. v. Thomas, 805 F.2d 410, 432 (D.C.Cir.1986)), this standard adequately has been met here.
 
 
 72
 Petitioners further challenge as arbitrary and capricious EPA's estimate of the quantum of visibility improvement which the agency expects to result from imposition of the Final Rule's emission limits at NGS. In arriving at its estimate that the Final Rule "should improve the winter seasonal average visibility above the rim of the [Grand Canyon] approximately 7 percent," 56 Fed.Reg. at 50,180, EPA discussed the estimates of three studies: (1) the Park Service's WHITEX estimate of 14% improvement, (2) the NGSVS estimate of at most a 2% improvement, and (3) a modelling study, conducted by Douglas Latimer and submitted during the comment period, which estimated a range of 4 to 8% improvement. Petitioners contend that EPA arrived at its 7% estimate in an arbitrary and capricious manner because, they contend, EPA failed to consider and place in the administrative record a new report prepared by Latimer in which he allegedly reconsiders his previous estimate of visibility improvement, reducing it to 3 to 4%. Petitioners additionally claim that failure to put this new report in the administrative record constitutes an abuse of discretion. We find Petitioners' challenge both legally untenable and factually misleading.
 
 
 73
 First, the challenge is legally untenable because it relies on this court's consideration of evidence--the new Latimer report--which is not a part of the administrative record. In the Act, Congress explicitly and unambiguously provided that "the record for judicial review shall consist exclusively " of certain specifically enumerated categories of materials. 42 U.S.C. § 7607(d)(7)(A) (emphasis added). "Nothing in the statute or its legislative history indicates that a party or the agency may reopen the record by placing additional materials (other than those required by the statute and wrongfully omitted by EPA) in the docket after promulgation of the rule." Lead Indus. Ass'n v. EPA, 647 F.2d 1130, 1183 (D.C.Cir.), cert. denied, 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980).[12] The new Latimer report was not included in the administrative record, nor was it required to be. EPA explains that the report was not directly related to NGS, but was instead submitted to EPA in the context of the GCVTC regional haze efforts under section 169B of the Act.
 
 
 74
 Additionally, Petitioners ignore the route for administrative and judicial review of "new information" and alleged "procedural errors" in the creation of the administrative docket that Congress created: 42 U.S.C. § 7607(d)(7)(B)'s mechanism for reconsideration by the agency. Petitioners have failed to move for reconsideration and are now trying to circumvent this congressionally mandated route by petitioning for direct judicial review. We therefore deny Petitioners' motion to supplement the administrative record and direct Petitioners to consult section 7607(d)(7)(B) in order to fashion their claim as a petition for reconsideration to EPA, as Congress had envisioned.
 
 
 75
 Second, even if this court were to consider Petitioners' argument on the merits, their challenge is misleading because Latimer himself indicates that Petitioners have misrepresented the statements and conclusions contained in his new report. We therefore reject Petitioners' argument that EPA has somehow acted arbitrarily or capriciously, or abused its discretion, through the manner in which it arrived at its estimate of visibility improvement.
 
 V. CONCLUSION
 
 76
 In the final analysis, Petitioners simply adhere to a different interpretation of the rather disparate and equivocal scientific data in the record. While Petitioners may not be satisfied with EPA's responses, it is not EPA's duty to satisfy all of the concerns of potentially affected or aggrieved parties. EPA conducted an extensive and involved notice and comment period, and adequately met its statutory obligation of responding to significant comments and criticisms under 42 U.S.C. § 7607(d)(6)(B). Notwithstanding Petitioners' challenge, the Final Rule is the result of a site-specific informal rulemaking process that included virtually unprecedented cooperation between the governmental agency and the directly affected parties. See generally D. Michael Rappoport & John F. Cooney, Visibility at the Grand Canyon: Regulatory Negotiations Under the Clean Air Act, 24 Ariz.St.L.J. 627 (1992). Petitioners' arguments afford no reason for this court disruptively to interject itself into the picture. Because Congress delegated to EPA the power to "regulate on the borders of the unknown," this court will not interfere with the agency's "reasonable interpretations of equivocal evidence." Public Citizen Health Research Group v. Tyson, 796 F.2d at 1505. Even if this case highlights how hard it is to engage in "reasoned decisionmaking" in cases involving scientific uncertainty, EPA's actions in promulgating the Final Rule were reasonable and within the bounds of its statutory authority, and not arbitrary and capricious.
 
 
 77
 The Districts' petition for review and motion to supplement the administrative record are accordingly DENIED.
 
 
 
 *
 Honorable Ruggero J. Aldisert, Senior United States Circuit Judge for the Third Circuit, sitting by designation
 
 
 [1]
 Central Arizona Irrigation and Drainage District, Maricopa-Stanfield Irrigation & Drainage District, New Magma Irrigation & Drainage District, and Harquahala Valley Irrigation District
 
 
 [2]
 It is noteworthy that SRP and the other joint-owners are the parties directly aggrieved by the Final Rule, yet they do not participate in Petitioners' challenge. In fact, SRP argues in support of the Final Rule as a respondent-intervenor
 
 
 [3]
 The joint-owners' percentages of participation is as follows: BOR, 24.3%; SRP, 21.7%; Los Angeles Department of Water and Power, 21.2%; Arizona Public Service Co., 14%; Nevada Power Co., 11.3%; Tucson Gas & Electric Co., 7.5%
 
 
 [4]
 The regulations provide the following definition of BART:
 Best Available Retrofit Technology (BART) means an emission limitation based on the degree of reduction achievable through the application of the best system of continuous emission reduction for each pollutant which is emitted by an existing stationary facility. The emission limitation must be established, on a case-by-case basis, taking into consideration the technology available, the costs of compliance, the energy and nonair quality environmental impacts of compliance, any pollution control equipment in use or in existence at the source, the remaining useful life of the source, and the degree of improvement in visibility which may reasonably be anticipated to result from the use of such technology.
 
 
 [40]
 C.F.R. § 51.301(c)
 
 
 [5]
 Summaries of these meetings were placed in the administrative record. See 56 Fed.Reg. at 50,177
 
 
 [6]
 Under section 403(b) of the Act, a regulated party may transfer SO sub2 allowances under an allowance trading program. See 42 U.S.C. § 7651b(b). EPA notes that sale of allowances may offset the required capital investment for control equipment. Thus, EPA argues, capital costs may never be passed on to the District
 
 
 [7]
 The relevant portion of paragraph (7)(B) more fully provides:
 If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule.... If the Administrator refuses to convene such a proceeding, such person may seek review of such refusal in the United States court of appeals for the appropriate circuit....
 42 U.S.C. § 7607(d)(7)(B).
 
 
 [8]
 For instance, in Motor Vehicle Manufacturers Association of United States, Inc. v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), the Supreme Court found an agency ruling arbitrary and capricious where the agency had "entirely failed to consider an important aspect of the problem." Id. at 43, 103 S.Ct. at 2867. State Farm shows that the "expertise model" does not necessarily mandate judicial deference, since the Court there took a "hard look" to ensure that the agency was in fact using its expertise in arriving at policy decisions
 
 
 [9]
 In the Final Rule itself, EPA made eminently clear that its action addressed Phase I visibility impairment rather than Phase II "regional haze." See 56 Fed.Reg. at 50,172. Pursuant to Congress's 1990 amendments to the Act, EPA subsequently established the Grand Canyon Visibility Transport Commission ("GCVTC"), 42 U.S.C. § 7492(f), whose duty it is to make recommendations on "promulgation of regulations under section 7491 of this title to address long range strategies for addressing regional haze which impairs visibility in affected class I [Federal] areas" like the Grand Canyon. 42 U.S.C. § 7492(d)(2)(C). Congress envisioned GCVTC as a long-term complement to EPA's then-pending efforts to remedy impairment at the Grand Canyon which was attributable to NGS. See 136 Cong.Rec. S2890 (March 21, 1990)
 
 
 [10]
 Petitioners incorrectly suggest that EPA was required to engage in "cost-benefit" analysis. Congress has not required "cost-benefit" analysis in the Act. Cf. American Textile Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 510, 101 S.Ct. 2478, 2491, 69 L.Ed.2d 185 (1981) ("When Congress has intended that an agency engage in cost-benefit analysis, it has clearly indicated such intent on the face of the statute.")
 
 
 [11]
 Actually, EPA not only considered the "reasonable progress" factors, but also considered expected visibility improvement under the Final Rule, as required by BART analysis
 
 
 [12]
 Petitioners' reliance on Kent County v. EPA, 963 F.2d 391 (D.C.Cir.1992) is misplaced because, unlike the Clean Air Act here, the statutory provision at issue in Kent County contained no special procedural provisions displacing general rules of administrative law governing the administrative record for judicial review. Compare 42 U.S.C. §§ 7607(d)(1), (d)(7)(A) with 42 U.S.C. § 9613(a)